UNITED STATES OF AMERICA,

        Plaintiff,

  v.                               Case No. 22-CR-26

JIMMY GONZALEZ-MACIAS,
a/k/a "JIMMY MACIAS,"

        Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils and Erica J. Lounsberry, Assistant United States Attorneys, and the defendant, Jimmy Gonzalez-Macias, individually and by attorney Edward J. Hunt, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in 2 counts of a 33-count second superseding indictment, which counts allege violations of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B), and Title 18, United States Code, Sections 2(a) and 924(c)(1)(A)(i).

3.     The defendant has read and fully understands the charges contained in the second superseding indictment. He fully understands the nature and elements of the crimes with which he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

<u>COUNT ONE</u>

**THE GRAND JURY CHARGES THAT:**

1.     Beginning by at least June 2020, and continuing until on or about November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"**
**ROY HENTON, a/k/a "Pops,"**
**JOATHAN I. COLULA,**
**JULIO BARRAZA,**
**DEONTE EDWARDS,**
**JIMMY GONZALEZ-MACIAS, a/k/a "JIMMY MACIAS,"**
**JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"**
**MICHAEL O. WILLIAMS,**
**JOELLE MASSEY,**
**KEVIN NELSON,**
**RAMONA FRYER,**
**CARLA SMITH, and**
**ITZEL CRUZ-GONZALEZ**

knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

2.     The amount involved in the conspiracy attributable to each defendant as a result of his and her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him and her, is 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a

2

Schedule II controlled substance; 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), and 841(b)(1)(B), and Title 18, United States Code, Section 2(a).

## COUNT TWENTY

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about November 29, 2022, in the State and Eastern District of Wisconsin,

### JIMMY GONZALEZ-MACIAS

knowingly possessed a firearm in furtherance of the drug trafficking offense charged in Count One of the Second Superseding Indictment.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

5.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

3

## PENALTIES

6.     The parties understand and agree that the offenses to which the defendant

will enter a plea of guilty carry the following maximum penalties:

> **COUNT ONE**: a mandatory minimum of 10 years and up to a lifetime term of imprisonment; a fine of up to $10 million; and at least five years and up to a lifetime term of supervised release. The count also carries a mandatory special assessment of $100.

> **COUNTY TWENTY**: a mandatory minimum of 5 years, and up to life imprisonment, which must run consecutive to any other sentence; a fine of up to $250,000; and up to 5 years of supervised release.

7.     The defendant acknowledges, understands, and agrees that he has

discussed the relevant statutes as well as the applicable sentencing guidelines with his

attorney.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.     The parties understand and agree that for the penalties in 21 U.S.C.

§ 841(b)(1)(A) to apply, as provided in paragraph 6 above, the government must prove

beyond a reasonable doubt that the offense to which the defendant is pleading guilty

involved at least 400 grams or more of a mixture and substance containing N-phenyl-N-

[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II

controlled substance; 500 grams or more of a mixture and substance containing

methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture

and substance containing heroin, a Schedule I controlled substance; 5 kilograms or more

of a mixture and substance containing a detectable amount of cocaine, a Schedule II

controlled substance; or 100 kilograms or more of a mixture and substance containing

4

marijuana, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

First, the conspiracy, as alleged in the indictment, existed, and;

Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

10.     The parties understand and agree that in order to sustain the charge of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), as set forth in Count Twenty, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant committed a drug trafficking crime; and

Second, the defendant knowingly possessed a firearm in furtherance thereof.

## SENTENCING PROVISIONS

11.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

14. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

15. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate

6

information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

16.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

17.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 4 kilograms of a mixture and substance containing fentanyl, a Schedule II controlled substance; at least 6.5 kilograms of cocaine, a Schedule II controlled substance; and at least 4 pounds of a mixture and substance containing methamphetamine, a Schedule II controlled substance.

## Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 34 under Sentencing Guidelines Manual § 2D1.1(c)(3).

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary

identification and disclosure to the government of any and all actual or potential victims of the offenses prior to sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

### Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The parties agrees to jointly recommend a sentence of fifteen years of imprisonment.

### Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence

8

authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.  If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26.     The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed

9

by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Fine

27.     The parties agree to recommend to the sentencing court that no fine be imposed against the defendant.

### Special Assessment

28.     The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

### Forfeiture

29.     The defendant agrees to the forfeiture of the properties listed in the second superseding indictment. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

### DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree

10

unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.    The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of

11

certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

34. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

35. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

12

36.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

39.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. Alternatively, the government may, in its discretion, ask the Court to be released from specific obligations under this plea agreement to reflect the defendant's conduct. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed

13

charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

<u>**VOLUNTARINESS OF DEFENDANT'S PLEA**</u>

40.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

14

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: Feb 25, 2025

_____
JIMMY GONZALEZ-MACIAS
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 02-25-2025

_____
EDWARD J. HUNT
Attorney for Defendant

For the United States of America:

Date: 2/26/2025

_____
RICHARD G. FROHLING
Acting United States Attorney

Date: 2/26/2025

_____
ELIZABETH M. MONFILS
ERICA J. LOUNSBERRY
Assistant United States Attorneys

15

## ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon court-authorized Title III interceptions, information provided by law enforcement agents, surveillance, controlled purchases of controlled substances, physical evidence seized, confidential sources, financial records, and other evidence. This information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

### Background

In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil", who established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois.

The investigation resulted in courts authorizing the monitoring of several cellular telephones used by DTO members, including the phones of DANIELS, Roy HENTON, and Jameel BRADLEY, SR.

Interceptions and other evidence revealed that, beginning by at least October 2021, Joathan COLULA and Jimmy GONZALEZ-MACIAS, California residents, supplied the DANIELS DTO with methamphetamine, cocaine, and fentanyl. Julio BARRAZA, a California resident, packaged and mailed the controlled substances to the DANIELS DTO using fictitious names. Deonte EDWARDS, also a resident of California, assisted DANIELS in purchasing controlled substances from the California-based sources of supply, used his business account to facilitate the payment of drug proceeds to the DTO's suppliers, and obtained, packaged, and sent controlled substances, including fentanyl, cocaine, and marijuana, to the DANIELS' DTO.

To date, court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO used United Postal Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels containing controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. COLULA, BARRAZA, and EDWARDS sent the drug parcels to DTO-related addresses in Milwaukee, Wisconsin, and St. Paul, Minnesota, using aliases and/or fictitious identifying information. During the course of the investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine (March 2022) and 1 kilogram of fentanyl (November 2022).

The investigation further revealed that DANIELS used various methods to send drug proceeds to the California-based suppliers. DANIELS used "ghost" bags by sending luggage, believed to contain drug proceeds, to Los Angeles, California, on flights that he did not board. On one occasion, COLULA was observed picking up a "ghost" bag. On another occasion, a "ghost" bag was lawfully searched, revealing $105,000 in bulk currency.

Throughout the course of the investigation, DTO members used various business bank accounts to conceal and disguise the nature of source of their drug proceeds. DTO members, including DANIELS, Roy HENTON, Joelle MASSEY, Ramona FRYER, and BRADLEY SR., deposited drug proceeds—in the form of cash and cashiers' checks—into (1) DANIELS' and Betty DANIELS' (B. DANIELS) business account, (2) COLULA's business account, and (3) EDWARDS' business account. DANIELS withdrew from his business accounts U.S. currency in the form of cashier's checks, which he then electronically transferred to EDWARDS' business account in the name of Tier One Records, which account EDWARDS used as a "funnel" account. After receiving the drug proceeds, EDWARDS then withdrew the money and provided the cash proceeds to the DTO's California-based suppliers, to include COLULA and GONZALEZ-MACIAS.

The DTO also used couriers to drive the controlled substances from California to the Midwest area of the United States at the direction of DANIELS. In January 2022, approximately 7 kilograms of cocaine were seized from a DTO courier while traveling from California to Milwaukee, Wisconsin, at the direction of DANIELS and BRADLEY SR.

As previously stated, DANIELS operated distribution locations in Milwaukee, Wisconsin; St. Paul and Minneapolis, Minnesota; and the greater Chicago, Illinois area. DANIELS was based in Milwaukee, where he operated at least one stash location at 52xx N. Teutonia Avenue, Apartment #4. HENTON, a Milwaukee-based conspirator, was identified as DANIELS' partner in DTO operations. HENTON manufactured and distributed controlled substances, frequented the Milwaukee DTO stash location, and retrieved parcels suspected to contain controlled substances. Kevin NELSON and Domonique LEWIS were identified as Milwaukee-based DTO distributors. MASSEY, DANIELS' long-term girlfriend based in Milwaukee, received narcotics-laden parcels, distributed controlled substances, and laundered and facilitated the movement of DTO proceeds. MASSEY also traveled to Chicago and California on behalf of the DTO.

In Minnesota, DANIELS and Michael WILLIAMS worked in tandem, i.e., partnership, to manufacture and distribute controlled substances in the St. Paul/Minneapolis metropolitan area. WILLIAMS and DANIELS operated a stash location in Minneapolis, Minnesota. Ramona FRYER was identified as a Minnesota-based DTO distributor who also received narcotics-laden parcels, operated a storage locker used to store drugs, frequented the Minnesota stash house, and laundered and facilitated

2

the movement of DTO proceeds. Carla SMITH, FRYER's mother, was also a Minnesota-based DTO distributor.

Furthermore, DANIELS and BRADLEY SR. worked in tandem, i.e., partnership, to procure controlled substances, to include methamphetamine and cocaine, for the DTO. BRADLEY SR. traveled with DANIELS to California and Memphis, Tennessee to facilitate and supply narcotics to the DTO. DANIELS and BRADLEY SR. also worked together to distribute controlled substances throughout the greater Chicago, Illinois, area. Itzel CRUZ-GONZALEZ also worked with BRADLEY SR. and DANIELS to procure controlled substances, including methamphetamine, from GONZALEZ-MACIAS. CRUZ-GONZALEZ also facilitated the DTO by packaging controlled substances, to include cocaine, and by accounting for DTO proceeds.

On November 29, 2022, case agents executed numerous federal arrest warrants for DTO members and search warrants at DTO-associated locations. The search warrants resulted in the seizure of over 10 kilograms of fentanyl (pressed fentanyl and fentanyl in pill form), approximately 7 ½ kilograms of cocaine, more than one kilogram of methamphetamine (crystal methamphetamine and methamphetamine pills), nearly 2 kilograms of heroin, ecstasy, oxycodone, approximately 170 pounds of marijuana, marijuana edibles, over $450,000, and 19 firearms.

### JIMMY GONZALEZ-MACIAS – Overview of DTO Involvement

GONZALEZ-MACIAS, a resident of California, supplied controlled substances, to include methamphetamine, cocaine, and fentanyl, to the DANIELS DTO, and specifically, to BRADLEY SR., CRUZ-GONZALEZ, and DANIELS. During the course of this investigation, GONZALEZ-MACIAS has had contact with DANIELS, BRADLEY SR., and CRUZ-GONZALEZ, using phone number (760) 906-xxxx. Between approximately November 8, 2022, and November 11, 2022, approximately 18 intercepted calls between GONZALEZ-MACIAS and DANIELS were deemed criminal and pertinent in nature. Between approximately November 8, 2022, and November 12, 2022, approximately 15 intercepted calls between GONZALEZ-MACIAS and BRADLEY SR. were deemed criminal and pertinent in nature. Additionally, between July 20, 2022, and November 11, 2022, MACIAS had 26 contacts with DANIELS, 76 contacts with BRADLEY SR., and 72 contacts with CRUZ-GONZALEZ.

Between November 7 and 10, 2022, DANIELS traveled to California on behalf of the DTO. During this trip, DANIELS met with GONZALEZ-MACIAS to procure controlled substances, and he also sent EDWARDS to GONZALEZ-MACIAS' house to provide payment and obtain controlled substances. DANIELS departed LAX on November 10, 2022. On November 11, 2022, a parcel destined to a Milwaukee DTO-related address was searched pursuant to a search warrant and found to contain one kilogram (1,019.7 grams) of fentanyl. Based upon intercepted calls, and the stamp or

3

"signature" on the fentanyl, case agents believe that the fentanyl was supplied by MACIAS.

### GONZALEZ-MACIAS and DANIELS Meet in California and
### GONZALEZ-MACIAS Supplies Controlled Substance

On November 7, 2022, DANIELS flew to LAX. Upon landing, DANIELS met with COLULA, and shortly after 8:00 p.m.,[1] investigators observed DANIELS park in front of EDWARDS' residence. Investigators observed EDWARDS standing on the sidewalk, greeting DANIELS, who was holding a duffle bag.

Location information for DANIELS' phone reflected that on the evening of November 8, 2022, he left EDWARDS' California residence around 8:30 p.m. and arrived in the vicinity of GONZALEZ-MACIAS's residence located at 19xx W. Broadway, Anaheim, California, around 12:00 a.m. on November 9, 2022. DANIELS' remained in the vicinity of GONZALEZ- MACIAS' residence until approximately 2:50 a.m.

On November 9, 2022, at approximately 8:52 p.m., DANIELS received a call from GONZALEZ-MACIAS at (760) 906-xxxx. During the call, DANIELS asked GONZALEZ-MACIAS what he was up to. GONZALEZ-MACIAS stated that he was almost to his (GONZALEZ-MACIAS') house. DANIELS then said, "Okay, we gon' slide; we gon' fall through." GONZALEZ-MACIAS responded, "Okay, uh, I was ask if you need the other one." DANIELS asked, "Um, you know, you know, the rest of that one that you had?" GONZALEZ-MACIAS stated, "Uh-huh." DANIELS replied, "I want to come get that." MACIAS then said, "All right, uh, the other one I finna—I finna keep breaking that one down." DANIELS stated, "Boy, I was on my way. I was on my way for it, Jimmy. After DANIELS repeated that he was on his way for it, GONZALEZ-MACIAS replied, "You wish. In case you want, you want to take half of it? If you want to take a nine-piece out of it, yeah?" DANIELS then said, "Okay cool; I do that." GONZALEZ-MACIAS then said, "Just leave me something, because you'd be, you'd be getting like one and two, so." DANIELS stated, "All right, I got you. Yeah, yeah then listen... I'm gonna be having my brother, my brother doing it. I'm gonna have my brother coming by for that two, ok?" GONZALEZ-MACIAS acknowledged. DANIELS continued, "'Cause I be doing some small ones out here and I let just so he can make some money... But he's our little runner. Whenever you need him, he's gon run. That's that one, the first number I sent you. It say, 'Deonte.'" GONZALEZ-MACIAS said, "Okay. Hold up, what do you—you want to leave him with a half right there just in case he comes?" DANIELS said, "Right, yeah, right.

---

[1]    To correlate the intercepted calls with surveillance activities, all time stamps during the period in which DANIELS was in California are still noted in Central Standard Time (CST).

4

See, that's what I'm saying, like when I, I want to do something like that. You know what I'm saying?"

Based on their training, experience, and knowledge of this investigation, case agents believe DANIELS wanted to purchase one kilogram of cocaine from GONZALEZ-MACIAS, who had two kilograms ("I was ask if you need the other one."). Agents further believe GONZALEZ-MACIAS told DANIELS he (GONZALEZ-MACIAS) was breaking down one of the kilograms and DANIELS could have a "nine-piece," which agents know is a reference to nine ounces of cocaine. GONZALEZ-MACIAS then told DANIELS that he (GONZALEZ-MACIAS) can give him half of the kilogram, or 500 grams, which DANIELS accepted. Agents further believe that DANIELS informed GONZALEZ-MACIAS that EDWARDS ("Deonte") is a runner (a person who picks up/delivers money and narcotics) for the DTO, and that EDWARDS will be assisting picking up narcotics. At approximately 10:35 p.m., GONZALEZ-MACIAS called DANIELS, who said that he "got an extra energy" and was on his way to meet GONZALEZ-MACIAS to pick up the cocaine.

On November 9, at 10:36 p.m., GONZALEZ-MACIAS called BRADLEY SR. During this call, BRADLEY SR. stated, "You met my brother last night." GONZALEZ-MACIAS responded, "Yep." BRADLEY SR. replied, "He like you, so we are gunna be doing more business with you." Case agents know that BRADLEY SR. and DANIELS refer to each other as "brother." Therefore, agents believe that this call reflects that GONZALEZ-MACIAS met DANIELS the previous night, November 8, 2022, and that BRADLEY SR. and DANIELS planned to arrange more drug business in the future.

Location information for DANIELS' cell phone reflected that on November 9, he left EDWARDS' residence at 10:33 p.m. and arrived in the vicinity of GONZALEZ-MACIAS' house around 11:15 p.m. DANIELS then left GONZALEZ-MACIAS's house around 12:20 a.m. the following day.

On November 10, at 11:29 a.m., GONZALEZ-MACIAS called DANIELS, at which time DANIELS stated, "I mean, like 12 o'clock." GONZALEZ-MACIAS stated, "Okay, I'm just waiting on this [U/I] to call me so I can go pick those up." DANIELS replied, "Tell that fool to bring his ass home. Tell him to get his ass up. We got shit to do. We trynna get that shit out today."

Case agents believe that during this call DANIELS was attempting to meet with GONZALEZ-MACIAS at 12:00 p.m. to purchase more controlled substances. Case agents knew that DANIELS had a flight to Chicago on November 10, 2022, and therefore believe

5

that DANIELS wanted MACIAS to hurry because DANIELS wanted to ship the controlled substances before his plane left.

At 11:30 a.m., GONZALEZ-MACIAS called DANIELS back and stated, "I just talked to him right now." DANIELS replied, "You did? What did he say?" GONZALEZ-MACIAS stated, "He told me to go pick up those two that he said he didn't come with the food for the other one, for the one." DANIELS replied, "Okay, cool. Well, go grab those two real quick, and then we just, we gonna try wrapping everything up."

Case agents believe that GONZALEZ-MACIAS told DANIELS he (GONZALEZ-MACIAS) called his controlled substance supplier and obtained two kilograms of a controlled substance to sell to DANIELS. GONZALEZ-MACIAS' supplier was unable to obtain the third kilogram that DANIELS had originally requested, but DANIELS indicated he would obtain those from GONZALEZ-MACIAS at a later time.

On November 10, at 5:39 p.m., DANIELS called GONZALEZ-MACIAS. DANIELS stated, "I'm sending my little brother to you because I'm getting on my plane, and he gonna handle everything." GONZALEZ-MACIAS replied, "Okay, I was gonna ask you, ummm, you need these two ASAP?" DANIELS replied, "I need them ASAP. Just, I'm send them—listen: Give them to my brother, you good to go." DANIELS later stated, "Take them what's his name. I'm gonna start sending you bread immediately. You hear me?" DANIELS continued, "The one who you—who's coming to you now, right? He's the one that's going to be bringing, he's the one who's going to be bringing money to you. You hear me? So, listen to me: You and me are going to be in communication all this week and all next week. You're going to have nothing but money coming. I gotchu. I gotchu." GONZALEZ-MACIAS replied, "Ok, yeah, 'cause—'cause I was gonna say, about that [U/I], remember I told you I was going to get that semi-truck tomorrow? Yeah, I [U/I] some bread for that, so."

Through interceptions, case agents know that DANIELS commonly refers to EDWARDS as his "brother" or "little brother." Therefore, case agents believe DANIELS told GONZALEZ-MACIAS he was sending EDWARDS to obtain two kilograms from MACIAS ("[Y]ou need these two ASAP?"). Case agents further believe that DANIELS told GONZALEZ-MACIAS that EDWARDS would be bringing GONZALEZ-MACIAS U.S. currency ("bread") in exchange for the controlled substances.

At 5:57 p.m., DANIELS called GONZALEZ-MACIAS and stated, "Don't worry about the, uhhh, Playboy right now. He gonna give you the other 15. Take—put that with that." GONZALEZ-MACIAS affirmed, "Okay, yeah." DANIELS said, "And hold that for what you giving me right now, okay? And then when I get home, right? . . . I'll send, I'll

send out some more and we can—we will wrap up that. We just tell your boys and them to hold off on the Playboy right now."

Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told GONZALEZ-MACIAS not to worry about the fentanyl ("Playboy") at the moment. Case agents further believe that DANIELS told GONZALEZ-MACIAS to put the money EDWARDS would soon be delivering towards the current drug order. DANIELS told EDWARDS that once he returned home, he would send more money for the fentanyl ("Playboy").

On November 10, at 7:00 p.m., DANIELS called EDWARDS. DANIELS stated, "You ain't responding quick enough." EDWARDS responded, "Oh, okay, you said. 'Did you give him the fifteen hundred?' Yeah, I gave him fifteen hundred and give you two. Oh yeah, he gave me two; yeah, he gave me two. Before he gives somethin' [U/I], I need to see what Morty gave [U/I]. Yeah, I'm just pulled up to Home Depot right now. [Stammers] Basically, yeah. Morty... I gotta count how much he gave, but, it feel like... It feel like it probably three or four." DANIELS stated, "Right, I have to see what it is first." DANIELS later stated, "You said he gave you—what is it he gave you? He shoulda gave you five." EDWARDS responded, "Well, it feel like that. That's what I'm sayin'. [Stammers] It felt like at least four." EDWARDS later said, "All right, bet. Fuckin aaa... well that n**** he was, I was gonna be dropping him off before I even got back to the crib. So, what I'll do is I'll just FaceTime you when I walk to Home Depot. And I'll show you what it is right there in the trunk." DANIELS later said, "Okay, so first of all, bro, bro I don't want you goin' to Home Depot and doin' all that. I want you to go home first." EDWARDS questioned, "So, I don't need the foam right now?" DANIELS stated, "You do. But you can go back out and get the foam, bro." DANIELS later said, "No, no, no, go take everything home first." EDWARDS affirmed, "All right." DANIELS later said, "Come on, now. Quick, boom, boom, boom. Always! Don't be in that. Nope. When you do too much, try to do more than one thing at the same time, you make mistakes. You don't wanna make mistakes."

Based on their knowledge of this investigation and this conversation, case agents believe that EDWARDS procured controlled substances for DANIELS through "Morty" and GONZALEZ-MACIAS. Because EDWARDS was in possession of a large amount of controlled substances, up to four or five kilograms, DANIELS was worried about EDWARDS not answering the phone. DANIELS was also concerned about EDWARDS going to Home Depot to get "foam" before "securing" the substances at his residence. Case agents know that members of the DTO have previously used foam to package controlled substances for shipment. Based on their training and experience, agents know traffickers do this to fill voids in the package and prevent the substances from being disturbed during transit. Case agents believe that DANIELS told EDWARDS to drive the controlled substances, including two kilograms from GONZALEZ-MACIAS to his residence and "secure" them before completing other tasks, because the longer the

7

controlled substances are in the vehicle the higher the likelihood that EDWARDS could be stopped by law enforcement or encounter another problem. EDWARDS' phone location data reflected that EDWARDS traveled to GONZALEZ-MACIAS' residence. Based on their training, experience, knowledge of this investigation, to include the intercepted calls and EDWARDS' location information, case agents believe EDWARDS obtained controlled substances from GONZALEZ-MACIAS that he later shipped to DANIELS.

As a result of DANIELS' California trip, case agents are aware of at least 5 drug-related parcels that were shipped to various DTO addresses. After DANIELS returned from California, he spoke with EDWARDS about ensuring EDWARDS "ha[d] enough money for supplies," to include "foam." DANIELS and EDWARDS also discussed the status of multiple parcels that were shipped to DTO addresses, trying to determine which ones were delivered and where the others were in transit.

### Seizure of 1 Kilogram of Fentanyl

On November 11, 2022, case agents located an 11-pound parcel, sent from California on November 8, 2022, to be delivered to 9905 West Fond Du Lac Avenue. The listed sender on the parcel was Diego BIRRUETA of 13330 Victory Boulevard, Van Nuys, California. The listed recipient of the parcel was Andre Garner of 99xx West Fond Du Lac Avenue, Apartment #1, Milwaukee, Wisconsin. The parcel was thereafter searched pursuant to a warrant. Upon opening the parcel, case agents found an off-white plastic dog food container surrounded by Styrofoam packing peanuts. Within that container agents located a white brick-like substance contained within multiple layers of wrapping and surrounded by other packaging materials to include children's items and foam. The substance consisted of 1,019.7 grams of fentanyl based on certified laboratory testing, and the kilogram was stamped with the Playboy Bunny logo in the center.

During an intercepted phone call on November 10, 2022, at 5:57 p.m., between DANIELS and GONZALEZ-MACIAS, using (760) 906-xxxx, DANIELS referenced "Playboy" numerous times. DANIELS stated, "Don't worry about the, uh, Playboy right now… Just tell your boys and them to hold off on the Playboy right now." Case agents know that traffickers commonly stamp their products as a signature. Based on the stamp located on the seized brick of fentanyl and the intercepted phone calls, case agents believe that DANIELS obtained the fentanyl from GONZALEZ-MACIAS.

### February 2022 Seizure of 4 Pounds of Methamphetamine and 5 Automatic Rifles

In February 2022, A.C. accepted a package at his residence in Chicago, Illinois, which contained approximately 4 pounds of crystal methamphetamine and 5 automatic rifles. Both SOI #4 and SOI #8 stated that the methamphetamine in this parcel was supplied by GONZALEZ MACIAS and that the rifles were obtained by a person named "Gucci." GONZALEZ MACIAS shipped the methamphetamine and these rifles.

According to SOI #4, CRUZ GONZALEZ introduced SOI #4 to "Gucci," who was previously a criminal associate of GONZALEZ MACIAS in crystal methamphetamine sales.

### Search Warrant Execution, GONZALEZ-MACIAS Post-Arrest Statement, and Forensic Cell Phone Examination

On November 29, 2022, a federal search warrant was executed at GONZALEZ-MACIAS' residence at 19xx W. Broadway Street, Anaheim, California. Officers located approximately 411 grams of cocaine, in brick form, in a kitchen cabinet. Located under the defendant's mattress in his bedroom was a Glock 26 firearm, bearing serial number BTSP331, which contained a fully loaded 30-round extended magazine and a switch, making it fully automatic. Also located in GONZALEZ-MACIAS's bedroom were 5 additional magazines (a 40-round rifle magazine, a 30-round rifle magazine, a 16-round rifle magazine, a 16-round pistol magazine, and a .22 pistol magazine). A box of 9mm ammunition and .45 caliber ammunition was also located on the top shelf of a closet, along with eight cellular telephones in the defendant's bedroom, and a scale with white residue in the garage. Of the eight phones, one was on the defendant's bed, and one was next to the bed. When agents called the phone number intercepted through the Title III wiretap interceptions, one of these phones began to ring. The other six cellular phones were located in a drawer.

On the day of his arrest, GONZALEZ-MACIAS also provided a *Mirandized* statement to officers. When interviewed, he identified co-defendants DANIELS and EDWARDS, acknowledged involvement in supplying narcotics to them, and confirmed his Glock handgun was affixed with a switch. Additionally, GONZALEZ-MACIAS reported that he met the source of supply for the seized kilogram quantity of fentanyl (which the defendant stated he believed to be cocaine) in Sinaloa, Mexico. The defendant reported having a two-year relationship with this supplier. According to the defendant, the supplier owed him (GONZALEZ-MACIAS) money after GONZALEZ-MACIAS gave him a significant quantity of money for a non-drug related purpose. The supplier thereafter paid the defendant with the kilogram of fentanyl. According to GONZALEZ-MACIAS, he provided the fentanyl on consignment to DANIELS and was to be paid with the distribution proceeds.

A forensic extraction of GONZALEZ-MACIAS's cellular telephone reflected drug trafficking activities dating back to at least February 2022. Specifically, located on one of the defendant's phones were pictures of bricks bearing various "stamps," believed to be kilogram quantities of narcotics, and what appears to be gallon-sized bags of what is believed to be large quantities of methamphetamine based upon the appearance of the contents being glass or ice-like. At least some of the pictures were included in encrypted WhatsApp communications, dating between February and April 2022, between the defendant and unidentified individuals, wherein they appear to negotiate prices.

9

## Source of Information Evidence

Source of Information (SOI #8) stated that CRUZ-GONZALEZ introduced GONZALEZ-MACIAS to BRADLEY SR. for the purposes of supplying controlled substances. SOI #8 knew GONZALEZ-MACIAS to be a cocaine, fentanyl, and crystal methamphetamine supplier who shipped these controlled substances to individuals throughout the United States. SOI #8 was aware that GONZALEZ-MACIAS sent a package containing methamphetamine and firearms to BRADLEY SR. in Illinois. The methamphetamine was purchased from GONZALEZ-MACIAS, the firearms from another individual.

According to SOI #8, SOI #8 traveled to California in November 2022 to procure controlled substances and send them back to Milwaukee and Minnesota. During this trip, SOI #8 met with COLULA, EDWARDS, and GONZALEZ-MACIAS. SOI #8 further stated that SOI #8 purchased 4-5 kilograms of cocaine and 2-3 kilograms of fentanyl from GONZALEZ-MACIAS at this time. SOI #8 stated that the fentanyl was named "Playboy" because it had a Playboy Bunny emblem stamped on the kilograms. SOI #8 paid $10,000 per kilogram of fentanyl and $15,000 per kilogram of cocaine. SOI #8 stated that the kilogram of fentanyl that was seized in Milwaukee was purchased from GONZALEZ-MACIAS. The controlled substances that SOI #8 purchased from GONZALEZ-MACIAS at this time were brought to an Airbnb, and EDWARDS and SOI #8 subsequently shipped the controlled substances to Wisconsin and Minnesota. After SOI #8 returned from California, GONZALEZ-MACIAS supplied SOI #8 with approximately 6 more kilograms for EDWARDS to ship to Minnesota or Wisconsin.

SOI #6 knew that ITZEL CRUZ-GONZALEZ introduced DANIELS to GONZALEZ-MACIAS so the two could discuss drug distribution.

SOI #4 stated SOI #4 was introduced to GONZALEZ-MACIAS through CRUZ-GONZALEZ. SOI #4 stated that CRUZ-GONZALEZ also introduced SOI #4 to GONZALEZ-MACIAS's drug associate for methamphetamine sales. However, GONZALEZ-MACIAS and the associate had a falling out after GONZALEZ-MACIAS stole $100,000 from his associate.

Regarding the February 2022 parcel that contained methamphetamine and the fully automatic rifles, SOI #4 stated that DANIELS purchased the methamphetamine from GONZALEZ-MACIAS, and that SOI #4 and DANIELS split the cost of the firearms, paying $900 per firearm. GONZALEZ-MACIAS did not supply the firearms, but did send package and send the methamphetamine and firearms to BRADLEY SR. in Chicago.

In addition to this methamphetamine, SOI #4 stated SOI #4 purchased 2-4 kilograms of cocaine from GONZALEZ-MACIAS and 2-3 kilograms of fentanyl. GONZALEZ-MACIAS referred to his fentanyl either as "china white" or "playboy." SOI

#4 bought a pound of crystal methamphetamine for $800, a kilogram of cocaine for $19,500, and a kilogram of fentanyl for $17,000.

## Conclusion

Based upon the evidence and what was reasonably foreseeable to GONZALEZ-MACIAS, GONZALEZ-MACIAS admits that he is responsible for the distribution of at least at least 4 kilograms of a mixture and substance containing fentanyl, a Schedule II controlled substance; at least 6.5 kilograms of cocaine, a Schedule II controlled substance; and at least 4 pounds of a mixture and substance containing methamphetamine, a Schedule II controlled substance.

GONZALEZ-MACIAS further admits that he possessed the Glock 26 firearm, bearing serial number BTSP331, which contained a fully loaded 30-round extended magazine and a switch, in furtherance of his drug trafficking activities.